# EXHIBIT A

STATE OF NEW HAMPSHIRE

ROCKINGHAM, SS                                                    SUPERIOR COURT

R & N Check Corp.

v.

Bottomline Technologies, Inc.

## COMPLAINT

R & N Check Corp, ("R & N"), by and through its attorneys, McLane, Graf, Raulerson and Middleton, Professional Association, hereby complains against Defendant, Bottomline Technologies, Inc. ("Bottomline"), as follows:

## I. INTRODUCTION

1.      In 2005, R& N sued Bottomline for patent infringement. R & N's patent was a business process patent, Patent No. US 6, 622, 128 (Patent '128), covering internet based legal bill management by, for example, insurance companies and other in-house law departments.

2.      Rather than take the case to trial, the parties agreed that Bottomline would pay a lump sum to R & N, and an earn out payment that was a fraction of what R & N might otherwise have been entitled to, but that applied broadly and conclusively to an array of Bottomline's legal spend management products. In this way, the parties bought peace.

3.      In 2011, Bottomline acquired another company that sold legal spend management services. Because the acquisition added business volume that increased what it was obliged to pay R & N under the settlement agreement, Bottomline sought construe its agreement such that it would only apply to those products that R & N could prove infringed Patent '128. In other words, Bottomline contends the parties settled the patent infringement action by agreeing that

Bottomline would pay a limited earn out payment on any product that R & N could prove infringed its patent.  The plain language of the parties' contract, the negotiating history and common sense contradict Bottomline's effort to re-deal its contract.

## II.  PARTIES

4.     R & N Check Corp., Inc. is a Nevada corporation with a principal place of business located at 7805 NW 70th St; Kansas City, MO.

5.     Bottomline Technologies, Inc. is a Delaware corporation with a principal place of business located at 325 Corporate Drive, Portsmouth, New Hampshire   03801.

## III.  FACTS

6.     R & N Check Corp. is owned by Jerry Bedell ("Bedell") and Dennis McKevitt ("McKevitt").  Bedell and McKevitt have spent their professional lives managing and consulting on the management of legal fees.

7.     In 1999, Bedell and McKevitt applied for, and on September 16, 2003 were granted, a business process patent.  The patent described "[a] process by which litigation or legal billing may be both recorded and monitored in conjunction with budgetary constraints."

8.     Bottomline Technologies, Inc. ("Bottomline"), among other products and services, provides "industry leading legal spend management solutions."

9.     Bottomline gained its foothold in "legal spend management" when it acquired a product known as Legal eXchange.

10.     In 2005, R & N sued Bottomline in the United States District Court for the Central District of California for infringing Patent '128.  The parties settled the lawsuit by their agreement dated January 25, 2006.

11.     The agreement required Bottomline to pay a lump sum at the time of the settlement and then to pay a percentage of its net revenue as further specified in the agreement ("earn-out").  It is this latter payment that is at issue.

12.     The settlement agreement provides that, [b]eginning on July 1, 2008, [Bottomline] will pay R & N a percentage of the aggregate Net Revenues in excess of $12,500,000 each fiscal year ending June 30 for Covered Products sold by [Bottomline] or its Affiliates to customers in the United States for use in the United States . . ." Attached as Exhibit A is a copy of that Patent Purchase and Settlement Agreement.

13.     The payments were tiered such that R & N would earn a ½ percent on revenues up to $15 million, 1 percent on revenues between $15 and $20 million and 1 ½ percent on revenues over $20 million.

14.     The parties dispute the meaning of the defined term "Covered Products."  The term was contractually defined as follows:

> 'Covered Product("s)' means (a) the version of [Bottomline's] product known as Legal eXchange that is commercially available on the Effective Date, and (b) any other product owned or made available for use or license by BT or its Affiliate and designed to permit U.S. users to manage spending on legal services provided by outside U.S. law firms via an electronic data transfer system or any other process that is covered in whole or in part by U.S. Patent No. 6,622,128.  For the avoidance of doubt, Covered Products does *not* include any products or modules that utilize a process or processes outside the scope of and entirely different from the items set forth in (a) or (b) above, whether or not such products or modules are used in connection with the item set forth in (a) or (b) above.

15.     R & N reads this language to mean that Bottomline owes it earn-out payments based on the revenues that derive from products offered by Bottomline or its affiliates that:  1. "permit U.S. users to manage spending on legal services by outside U.S. law firms . . . "; or, 2. that involve a product covered by Patent '128.

16.     Bottomline, interprets the agreement so that it applies only to those of its and its affiliates' products that are covered by Patent '128.

17.     The defined term "Covered Product" is especially critical given Bottomline's 2011 acquisition of Allegiant---a company that had a significant share of the "legal spend management" marketplace.  According to Bottomline, a substantial portion of the revenues generated by Allegiant's (now Bottomline's) products do not count in computing the earn-out payments it owes R & N because, it says, those products are not covered, in whole or in part, by Patent '128.

18.     In April 2011, Bottomline acquired Allegient Systems, Inc. ("Allegient"). Allegient provides a legal spend management solution (the "Allegient Product") that, depending on what the customer has purchased, can include a budgeting module.

19.     Bottomline argues that unless its customer elects to purchase the budgeting module as part of the product sold, the Allegiant revenue does not count as a product "owned or made available for use or license by BT  or its Affiliate and designed to permit U.S. users to manage spending on legal services provided by outside U.S. law firms via an electronic data transfer system…"

20.     It is especially important to Bottomline that it minimize the amount of revenue generated by Allegiant that is counted for purposes of computing the earn out payments due R & N because with Allegiant's sales included, the revenue upon which R & N's earn out payments are computed is in the vicinity of $30 million---i.e., well over the threshold that triggers an earn out payment of 1 ½ percent of the revenue base.

21.     There is no dispute that Bottomline's newly acquired market share involves products that "permit U.S. users to manage spending on legal services provided by outside U.S. law firms via an electronic data transfer system."

22.     R & N contends that the plain text of the parties' earn out agreement supports its position.  In particular, Bottomline's interpretation fails to account for the disjunctive "or" contained in the critical sentence.  That "or" signifies that a product is a covered product no matter whether it permits U.S. users to manage spending on legal services provided by outside U.S. law firms generally "or" entails a product that is covered by Patent '128.

23.     The only thing Bottomline can attempt to do with the "or" to avoid the plain meaning of the clause is to contend that the "or" is intended to cover products that allow U.S. users to manage outside legal spends where the management is "via an electronic data transfer system" or "any other process."  Of course, were that the case, then that language "via an electronic data transfer system" would be extraneous.

24.     Bottomline will also argue that one must look beyond the contract language and admit parol evidence to establish a meaning that cannot be found in plain language itself.  For instance, Bottomline suggests that R & N's interpretation cannot hold sway because any product that is covered in whole or in part by Patent '128 is one that is used to manage legal spends, making identification of a covered product redundant.

25.     Without agreeing to Bottomline's factual assumption, this argument is unavailing.  Even if the clause were determined to be redundant, that would only denote the importance the parties' placed on assuring there was no mistake about what was a covered product.

26.     Indeed, the settlement agreement memorializes the parties' resolution of their patent litigation, a controversy that stemmed from a dispute over the coverage of the '128 Patent.

27.     Bottomline's interpretation, i.e., that a covered product was only one that was covered by Patent '128, would therefore have the reader believe that the parties resolved their patent litigation by agreeing to be guided by the scope of the patent they were at loggerheads over.

28.     In other words, Bottomline's interpretation would mean that Bedell and McKevitt, who are highly attuned to the need to avoid expensive litigation over complicated issues, agreed to invite exactly that outcome in settlement of just such a dispute. Bottomline's interpretation has the parties stipulating to a settlement, enforcement of which is contingent on their being able to establish (or their agreement to) to the application of the patent.

29.     Bottomline has also posited that the negotiating history supports its construction. As Bedell and McKevitt, who were personally involved in those negotiations, can testify, Bottomline is again mistaken. For instance, during the negotiations Bottomline proposed the following language:

> Covered Product(s)' means (a) the version of BT's product known as Legal eXchange™ that is commercially available on the Effective Date, and (b) any other product owned or used by BT and designed to permit users to manage spending on legal services provided by outside law firms that, but for BT's ownership of U.S. Patent No. 6,622,128, would infringe U.S. Patent No. 6,622,128.

30.     R & N flatly rejected that language and it does not appear in the parties' contract. Of course, had Bottomline's language been the language included in the settlement agreement, it would have exactly supported Bottomline's current position.

31.     By contrast, the language proposed by R&N on January 23 (in a draft dated January 20, 2006) is almost the exact language that today defines "covered products" as follows (emphasis added):

> (b) any other product owned or available for use or license by BT or its Affiliate and designed to permit U.S. users to manage spending on legal services provided by outside U.S. law firms via an electronic data transfer system *or (c)* any other

products that utilize the process that is covered in whole or in part by U.S. Patent No. 6,622,128. (emphasis added).

32.    On January 24, 2006, Bottomline agreed to exactly this language, removing only the subheading "c," but otherwise preserving the language R & N was insisting upon in full.

33.    In addition, the discourse between the parties that surrounded Bottomline's acquiescence to R & N's proposal as to the scope of the meaning of "covered products" highlights the fact that the parties understood that the earn out applied to the revenue generated by "the legal spend management business," and was not limited solely to those products that could be proven to be covered in whole or in part by Patent '128.


## COUNTS

## BREACH OF CONTRACT

34.    New Hampshire courts give contract language "its reasonable meaning, considering the circumstances and the context in which the agreement was negotiated, and reading the document as a whole." *Birch Broadcasting, Inc. v. Capitol Broadcasting Corp., Inc.,* 13 A.3d 224, 228 (N.H. 2010).

35.    A written agreement is given "the meaning intended by the parties when they wrote it. Absent ambiguity, however, the parties' intent will be determined from the plain meaning of the language used in the contract." *Id.* (internal citation and quotation marks omitted); *see also Kessler v. Gleich*, 13 A.3d 109, 112 (N.H. 2010). ("Unless the agreement contains ambiguous terms, we limit our review to the four corners of the document itself.").

36.    In determining the intent of the parties, the "trier of fact should consider the objective meaning of the expressed contract terms." *Behrens v. S.P. Const. Co., Inc.*, 904 A.2d 676, 681 (N.H. 2006) (internal quotation marks omitted).

37.     Nothing in the present case justifies adding to, deleting from, substituting, or otherwise modifying the contractual text chosen by the parties. "[A] court will reform a contract only if the evidence is clear and convincing that: '(1) there was an actual agreement between the parties, (2) there was an agreement to put the agreement in writing and (3) there is a variance between the prior agreement and the writing.'" *Patterson v. Tirollo*, 581 A.2d 74, 77 (N.H. 1990). None of the circumstances for contract reformation exist here.

38.     Bottomline's position, that R & N settled its infringement action by limiting its upside on royalties, while deferring to another day the question of whether its patent covered, in whole or in part, Bottomline's products, does not reflect a rational commercial position.

39.     By misconstruing the parties' settlement agreement, Bottomline has deliberately avoided its obligation to pay R & N agreed to royalties.

40.     This refusal on Bottomline's part to pay what it agreed to pay appears to be due to its belief that if it could make administration of the settlement agreement difficult for R & N, it could garner a discount from its lawful obligation under its negotiated agreement.

WHEREFORE, R & N prays that the Court:

A.     Declare Bottomline in default of the parties' settlement agreement;

B.     Award R & N damages for Bottomline's breach of its contract;

C.     Award R & N attorneys' fees and costs for having to enforce the parties' settlement agreement the terms of which are plain on their face: and,

D.     Award such other and further relief as it deems appropriate.

Respectfully submitted,

R & N CHECK CORP.

By Its Attorneys,

McLANE, GRAF, RAULERSON & MIDDLETON,
 PROFESSIONAL ASSOCIATION

Date: 2/11/13                    By: _____
                                     Scott H. Harris, NH Bar No. 6840
                                     scott.harris@mclane.com
                                     900 Elm Street, P.O. Box 326
                                     Manchester, New Hampshire 03105
                                     Telephone (603) 625-6464

- 9 -

*EXHIBIT A*

## PATENT PURCHASE AND SETTLEMENT AGREEMENT

THIS PATENT PURCHASE AND SETTLEMENT AGREEMENT (this "Agreement") is entered into as of January 25, 2006 (the "Effective Date"), by and between BOTTOMLINE TECHNOLOGIES, INC., a Delaware corporation with an address at 325 Corporate Drive, Portsmouth, New Hampshire, 03801 ("BT") and R&N CHECK CORP., a California corporation with an address at 10605 Balboa Blvd, Suite 300, Granada Hills, California 91344 ("R&N").

WHEREAS, R&N desires to sell to BT and BT desires to buy from R&N the Transferred Property (as defined below) on the terms and conditions set forth in this Agreement; and

WHEREAS, R&N and BT desire to settle the Pending Action (as defined below) on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledge, BT and R&N hereby agree as follows:

1.    DEFINITIONS.

When capitalized in this Agreement, the following terms shall have the meanings set forth below:

(a)    "*Affiliates*" means any entity, which is controlled by, controls or is under common control with the entity concerned. For this purpose, the word "control" means the direct or indirect ownership of more than fifty (50%) percent of the voting equity of such entity.

(b)    "*BT Costs*" means (i) any costs, fees or expenses (including attorneys' fees) incurred by BT or its Affiliates in connection with the negotiation, due diligence, documentation or other activities related to item "(a)" in the definition of "Recovered Amounts" or the litigation, settlement, negotiation, due diligence, documentation or other activities related to item "(b)" in the definition of "Recovered Amounts", plus (ii) 15% of the amounts actually received by BT or the Affiliate from an unaffiliated, independent third party for the items set forth as "(a)" and "(b)" in the definition of "Recovered Amounts".

(c)    "Encumbrances" means any claims, actions, suits, proceedings, investigations, charges, liens, contracts, rights, options, security interests, mortgages, writs, judgments, injunctions, or other encumbrances or restrictions.

(d)    "*Covered Product(s)*" means (a) the version of BT's product known as Legal eXchange™ that is commercially available on the Effective Date, and (b) any other product owned or made available for use or license by BT or its Affiliate and designed to permit U.S. users to manage spending on legal services provided by outside U.S. law firms via an electronic data transfer system or any other process that is covered in whole or in part by U.S. Patent No. 6,622,128. For the avoidance of doubt, Covered Products does *not* include any products or modules that utilize a process or processes outside the scope of and entirely different from the items set forth in (a) or (b) above, whether or not such products or modules are used in connection with the item set forth in (a) or (b) above.

(e)  *"Earn-Out Payment"* shall have the meaning set forth in Section 3(b), below.

(f)  *"Liabilities"* shall have the meaning set forth in Section 9, below.

(g)  *"Net Revenue"* means any revenues recorded and collected by BT or its Affiliates from an unaffiliated third party for use of any Covered Products, except fees that are expressly excluded by this definition, after deduction of normal trade discounts actually granted, any credits actually given, any costs of packaging, insurance, carriage and freight, any value added tax or other sales tax, reimbursed travel expenses and any import duties or similar applicable government levies. Net Revenue shall *not* include any fees charged separately for services, such as, without limitation, training, implementation services and custom development services, whether or not related to Covered Products. For the avoidance of doubt, BT's and its Affiliate's normal operating costs, such as, but not limited to payroll, rent, advertising, marketing, sales commissions and any other costs incurred by BT or its Affiliates in the routine conduct of business are not deducted from gross figures and are not applied to any calculation used to determine Net Revenue.

(h)  *"Pending Action"* means *R&N Check Corp., v. Bottomline Technologies, Inc., et. al.*, Case No. CV05-4019 GPS (AJWx), pending in the United States District Court for the Central District of California, Western Division (the *"Court"*).

(i)  *"Recovered Amounts"* means any amounts actually received by BT or a BT Affiliate from a non-affiliated, independent third party for (a) an express license to U.S. Patent No. 6,622,128, where such patent is the principal focus of the agreement and the primary licensed patent, or (b) resolution of a claim of infringement of the Patent made by BT, whether in the form of a settlement or damage award, in all cases after deduction of BT Costs (as defined above). For the avoidance of doubt, Recovered Amounts shall *not* include (i) any amounts received in connection with the sale, license or other transfer of all or substantially all of BT's (or its Affiliate's) patent portfolio or any transaction where U.S. Patent No. 6,622,128 is not the principal focus of the agreement, (ii) any amounts paid by customers of BT or its Affiliates in the ordinary course of business, such as, without limitation, Net Revenues and the amounts expressly excluded from the definition of Net Revenues.

(j)  *"Stipulation"* shall have the meaning set forth in Section 10(a), below.

(k)  *"Transferred Property"* means, collectively, (a) U.S. Patent No. 6,622,128, (b) all reissuances, continuations, continuations-in-part, revisions, extensions, foreign equivalents and reexaminations of U.S. Patent No. 6,622,128 (collectively with U.S. Patent No. 6,622,128, the *"Patent"*), (c) the right to sue for past, present and future infringement of the Patent (including, without limitation, any current claims), to otherwise enforce the Patent, and all other rights and protections relating thereto, in any and all countries, (d) all other intellectual property (except for the property described below) that is used or useful in connection with the use or application of the Patent, including, without limitation, any applicable know how, trade secrets, and copyrights, and (e) any invention documents and prosecution files for the Patent and the items described in subpart (d) immediately above, including, without limitation, all drafts, notes, drawings, official correspondence with the United States Patent and Trademark Office and copies of cited references, and the original

patent.  Subpart (d), above, specifically does *not* include any software, system or program designed or owned by the principals of R&N, or by any of their business interests or holdings other than R&N, at the time of this transaction.  This agreement acknowledges that at the time of this agreement, the principals of R&N owned in whole or in part a program, Internet software or system referred to as *LPM*, which is distinctly *not* a consideration or part of or included in this transaction.

(l)    "*Up-Front Payment*" shall have the meaning set forth in Section 3(a), below.

2.    SALE OF TRANSFERRED PROPERTY.

R&N on behalf of itself and its predecessors, successors in interest, present and future parent companies, subsidiaries and affiliates, officers, directors, employees, stockholders and agents, hereby irrevocably and unconditionally sells, assigns, transfers and conveys to BT the entire right, title and interest in and to the Transferred Property.  Within ten (10) business days of the Effective Date, R&N shall deliver to BT all tangible embodiments, except LPM as described in 1(k) above, of the Transferred Property.  All Transferred Property available in electronic media shall be transferred to BT on such media.

3.    PURCHASE PRICE.

In full consideration for the Transferred Property, BT shall pay to R&N the Up-Front Payment and Earn-Out Payments described below and a share of Recovered Amounts as described in the following Section 4.

(a)    Up-Front Payment.  Within thirty (30) days of the date on which the Stipulation is signed and filed with the Court, but not earlier than BT's receipt of all tangible embodiments of the Transferred Property as required by Section 2, BT will pay to R&N an up-front payment in the amount of $935,000 (Nine Hundred Thirty Five Thousand Dollars) (the "*Up-Front Payment*").  Such amount shall be paid by a wire transfer to a U.S. bank account designated by R&N.

(b)    Earn-Out Payment.  Beginning on July 1, 2008, BT will pay to R&N a percentage of the aggregate Net Revenue in excess of $12,500,000 each fiscal year ending June 30 for Covered Products sold by BT or its Affiliates to customers in the United States for use in the United States in such year ("*Earn-Out Payment(s)*") as follows:

| | | |
|---|---|---|
| Revenues below | $12,500,000 | 0.0% |
| Revenues between | $12,500,000 and $15,000,000 | 0.5% |
| Revenues between | $15,000,000 and $20,000,000 | 1.0% |
| Revenues above | $20,000,000 | 1.5% |

The Earn-Out Payments shall apply solely for the duration of the term of U.S. Patent No. 6,622,128; except in the case where BT or the subsequent owner of the patent intentionally invalidates it or allows it to lapse in which case the Earn-Out Payments shall apply through June 25, 2019.  Within thirty (30) days of the end of each calendar quarter, BT shall pay to R&N the Earn-Out Payment due for such quarter, if any.  Accompanying each quarterly

payment shall be a detailed statement providing the basis for the calculation of the earn-out and containing a statement signed by an officer of BT certifying as to its accuracy; provided, however, that such statement shall not be required to disclose customer names, customer specific revenues or other customer specific information.

4.    SHARE OF RECOVERY; FINDER'S FEE.

Each year during the remaining term of U.S. Patent No. 6,622,128, BT shall pay to R&N 25% of all Recovered Amounts received by BT and/or its Affiliates during such year.  Within thirty (30) days of the end of each applicable calendar year, BT shall pay to R&N the Recovered Amounts due for such year, if any.

BT and R&N, or the principals of R&N, shall negotiate in good faith the terms of a separate agreement to establish a finder's fee arrangement under which BT will pay to R&N 2% of Net Revenue paid to BT by any target company approved by BT in such separate agreement ("Covered Target") for and during the initial term of any new agreement executed by BT and the Covered Target on or before June 30, 2007.

5.    REPRESENTATION AND WARRANTIES.

R&N represents, warrants and covenants that as of the date of this Agreement:

(a)    R&N is a California corporation in good standing;

(b)    Immediately prior to execution of this Agreement, R&N was the sole owner of all right, title and interest in and to the Transferred Property, free and clear of all Encumbrances;

(c)    Upon execution of this Agreement, BT will be the sole owner of all right, title and interest in and to the Transferred Property, free and clear of all Encumbrances;

(d)    R&N has not entered into any conflicting contracts, has no contrary obligations and has not granted any person or entity any rights in connection with the Transferred Property;

(e)    To the best of R&N's knowledge, the Patent is valid and enforceable and,

(f)    Except for the claims made in the Pending Action, no claims of infringement, invalidity or unenforceability have been made in connection with the Transferred Property;

(g)    Except for the Pending Action, there is no pending or threatened  Encumbrances involving the Transferred Property;

(h)    To R&N's knowledge, there are no existing facts or conditions which could reasonably be expected to give rise to any Encumbrances involving the Transferred Property;

(i)    Neither R&N nor the inventors made any material misstatements or misrepresentations to the patent office or engaged in any fraud on the patent office (e.g., the patent office was informed of all material matters);

-4-

(j)     R&N has no knowledge of any invalidating prior art or any Liabilities in connection with the Transferred Property;

(k)     The inventors are properly identified in the Patent;

(l)     Except for the Transferred Property , R&N has no other patents, pending patent applications or trade secrets that could reasonably be expected to affect BT's ability to exploit the Transferred Property, the products and services of Visibillity, Inc., or BT's product known as Legal eXchange™;

(m)     To R&N's knowledge, no third party has any patents, pending patents or trade secrets that could reasonably be expected to affect BT's ability to exploit the Transferred Property, and market and sell the products and services of Visibillity, Inc., or BT's product known as Legal eXchange™;

(n)     Neither the execution and delivery of this Agreement by R&N or the other documents and instruments contemplated hereby, the consummation by R&N of the transactions contemplated hereby or thereby, nor the performance by R&N of this Agreement and such other agreements in compliance with the terms and conditions hereof and thereof will (i) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority or any other third party, (ii) violate or result in a breach of any mortgage, indenture, note, license, agreement or other instrument, agreement or obligation related to R&N or R&N's ability to consummate the transactions contemplated hereby or thereby, (iii) violate any judgment, order, writ, injunction, decree, statute, rule or regulation applicable to R&N or the Articles of Incorporation or Bylaws of R&N, or (iv) result in the creation of any Encumbrance upon the Transferred Property; and

(o)     No statements, representations or warranties made by R&N to BT in connection with the Pending Action or this Agreement contain or involve any untrue statement of material fact, or omits to state a material fact necessary to make the statement not materially misleading or untrue.

All representations, warranties and covenants made by R&N in this Agreement shall survive the closing.  In the event of a breach of any representation, warranty or covenant made by R&N in this Agreement, or any breach of Section 7(a), Section 0, or Section 10(c) of this Agreement, or in the event that the Patent is deemed to be invalid or otherwise unenforceable, BT's obligation to pay any further Earn-Out Payments or Recovered Amounts shall immediately cease.  BT shall also have any remedies available at law or in equity.

5A.     Representations and warranties of BT

BT represents, warrants and covenants that as of the date of this Agreement:

(a)     <u>Organization</u>.  BT is a Delaware corporation in good standing.

(b)     <u>Non-Contravention</u>.  The execution and delivery of this Agreement (or any other agreement or instrument referred to herein) by BT does not, and the performance of its obligations hereunder (or thereunder) and consummation of the transactions contemplated

hereby (or thereby) will not, (i) conflict with or result in a violation or breach of any of the terms, conditions or provisions of any instrument, contract or agreement to which BT is a party or by which BT is bound, including without limitation the certificate of incorporation or bylaws of BT or any mortgage, security agreement, deed of trust, lease, loan or credit agreement; or (ii) conflict with or result in a violation or breach of any term or provision of any law, judgment, ruling, decree or order applicable to BT.

(c)     No statements, representations or warranties made by BT to R&N in connection with this Agreement contain or involve any untrue statement of material fact, or omits to state a material fact necessary to make the statement not materially misleading or untrue.

All representations, warranties and covenants made by BT in this Agreement shall survive the closing.

6.     HOLD HARMLESS. R&N hereby agrees to indemnify, defend (except to the extent BT elects to assume the defense) and hold harmless BT against any and all claims, suits, losses, liabilities, damages, costs, fees and expenses (including reasonable attorneys' fees) (collectively, "*Losses*") resulting from or arising out of R&N's breach of any representation, warranty or covenant set forth in this Agreement or any Liabilities of R&N (collectively, "Indemnified Claim(s)"). If an Indemnified Claim arises, BT shall have the right, but not the obligation, to control the defense of such claim with counsel of its own choosing, but, whether or not BT exercises its option to control the defense of such claim, R&N shall be fully liable for all Losses, as provided above.

BT hereby agrees to indemnify, defend and hold harmless R&N against any and all claims, suits, losses, liabilities, damages, costs, fees and expenses (including reasonable attorneys' fees) (collectively, "*Losses*") resulting from or arising out of BT's breach of any representation, warranty or covenant set forth in this Agreement (collectively, "Indemnified Claim(s)"). If an Indemnified Claim is asserted by a third party against R&N, BT shall have the right, but not the obligation, to control the defense of such claim with counsel of its own choosing.

7.     FURTHER ASSURANCES.

(a)     <u>Further Assurances</u>. R&N and the named inventors, Jerry L. Bedell and Dennis W. McKevitt, shall execute such other documents and otherwise assist BT as reasonably requested from time to time in connection with the enforcement of BT's rights in the Transferred Property or otherwise to more effectively transfer, convey, assign or confirm BT's title in the Transferred Property. R&N shall ensure that all relevant inventors comply with this provision.

(b)     <u>Patent Assignment</u>. Concurrently with execution of this Agreement R&N will execute the form of patent assignment attached hereto as Attachment I. R&N agrees that BT may record such assignment at the United States Patent and Trademark Office.

(c)     <u>Patent Maintenance Fees</u>. BT or any subsequent owner of the patent shall pay all maintenance fees due to the United States Patent and Trademark Office in connection with the Patent.

8.   COVENANT NOT TO COMPETE.  The Principals (including Jerry L. Bedell and Dennis W. McKevitt) and its affiliates, including R&N Check, TECUM Inc. (a Missouri corporation), and TECUM Inc. of Illinois (an Illinois corporation), covenant and agree not to engage in any activity that is or could reasonably be expected to be competitive with the business or activities of BT.

Notwithstanding the foregoing, the following specific activities are deemed to not be competitive with BT:

- The manual audit of legal bills, using actual 'hard copy' invoices, and the use of a database to store the results.  The parties agree that any use of auditing or legal spend management software or other electronic processing system in the performance of the audit is deemed competitive.

- Manual review of law firm case files and legal bills in conjunction with those case files.  The parties agree that any use of auditing or legal spend management software or other electronic processing system in the performance of the audit is deemed competitive.

- Litigation management consulting unrelated to electronic legal spend management.

- Expert witnesses in the fields of litigation management, legal fees and billing practices, and insurance claims matters.

- Direct handling of claims, such as those provided by a third-party claims administrator.

- Seminars on litigation management and claims management.

- Electronically forwarding or delivery of invoices as email attachments.

9.   LIABILITIES NOT ASSUMED.  BT shall not assume, pay or become obligated to pay, perform or discharge any of the obligations or liabilities of R&N (collectively, "*Liabilities*"), whether accrued or unaccrued, known or unknown, disclosed or undisclosed, matured or unmatured, absolute, contingent or otherwise, incurred before, on or after the Effective Date, whether or not incurred in connection with the Transferred Property.  R&N shall remain responsible and liable for its Liabilities.

10.   SETTLEMENT AND RELEASE OF CLAIMS.

(a)   Stipulation.  Within two (2) business days of execution of this Agreement by both parties, the parties shall execute and file with the Court (as defined in Section 1(h),above) a joint stipulation of dismissal of the Pending Action with prejudice, in substantially the form attached hereto as Attachment II (the "*Stipulation*").

(b)   Release of Claims.  R&N and its Affiliates on behalf of itself and its predecessors, successors in interest, present and future parent companies, subsidiaries and affiliates, its and their officers, directors, employees, stockholders and agents (collectively, the "*R&N Family*"), hereby releases and forever discharge BT and its Affiliates, and each of its and their predecessors, successors in interest, present and future parent companies, subsidiaries

-7-

and affiliates, including any subsidiaries, companies, technologies, assets or businesses previously or in the future acquired, its and their officers, directors, employees, stockholders, agents, vendors, distributors, and customers, in both their individual and representative capacities (collectively, the "*BT Family*"), of and from all manner of actions, causes of actions, rights, losses, costs, expenses, whether direct, indirect or consequential, claims and demands for damage or loss arising in any way in connection with the Transferred Property, the products and services of Visibillity, Inc. or BT's product known as Legal eXchange™, whether or not now known, existing or anticipated, including, without limitation, the Pending Action, which will be dismissed with prejudice; provided however, that this release does not apply to any claim for breach of this Agreement or to any rights and obligations created by this Agreement.

(c) <u>Release of Claims</u>.  BT on behalf of itself and its predecessors, successors in interest, present and future parent companies, subsidiaries and affiliates, its and their officers, directors, employees, stockholders and agents, hereby releases and forever discharge R&N and its Affiliates, and each of its and their predecessors, successors in interest, present and future parent companies, subsidiaries and affiliates, including any subsidiaries, companies, technologies, assets or businesses previously or in the future acquired, its and their officers, directors, employees, stockholders, agents, vendors, distributors, and customers, in both their individual and representative capacities, of and from all manner of actions, causes of actions, rights, losses, costs, expenses, whether direct, indirect or consequential, claims and demands for damage or loss arising out of the Pending Action; provided, however, that this release does not apply to any claim for breach of this Agreement or to any rights and obligations created by this Agreement.

(d) <u>Covenant Not to Sue</u>.  R&N on behalf of itself and the R&N Family (as defined above) hereby further covenants not to sue and agrees not to make any claim or institute or participate in any proceedings against any member of the BT Family (as defined above) or any other individual, partnership, association, trust, unincorporated organization, corporation, or other entity in any way (except as expressly requested by BT) in connection with the Transferred Property, the products and services of Visibillity, Inc., or BT's product known as Legal eXchange™, including, without limitation, any claim for contribution or indemnity, except for claims of breach of this Agreement.  Further, R&N on behalf of itself and the R&N Family represents, warrants and covenants that it shall not challenge the validity of the Patent or assist any third party to challenge the validity of the Patent.

(e) <u>No Admission of Liability</u>.  Neither party makes any admission of liability with respect to the Pending Action and neither party acknowledges the merits of any claim which was, or could have been, made in the Pending Action.

11. AUTHORITY.  Each party represents and warrants that (a) it has the necessary power and authority to enter into and perform under this Agreement, (b) the person(s) executing this Agreement and the attachments hereto on its behalf has actual authority to bind such party to such agreements, (c) the Agreement and its attachments constitute the legal, valid and binding obligation of such party enforceable in accordance with their terms, except as limited by law.

12.    NOTICE.  Any notice required or contemplated by this Agreement shall be in writing, delivered in person, by nationally-recognized overnight courier, or by registered or certified mail with return receipt requested, addressed to the parties at the addresses set forth above.

Delivery shall be deemed to have occurred: upon delivery, when delivered in person; one (1) business day after posting if sent by nationally-recognized overnight courier; and, three (3) business days after posting if sent by registered or certified mail, return receipt requested.  Said notices shall become effective on the date of receipt or the date specified within the notice, whichever comes later.  Either party may change its address for notification purposes by mailing a notice (in accordance with this Section 12) stating the change and setting forth the new address.

13.    GENERAL PROVISIONS.

(a)    Costs.  Each party shall cover their own costs incurred in connection with the Pending Action and negotiation and performance of this Agreement.

(b)    Irreparable Harm.  R&N acknowledges and agrees that money damages would be insufficient to compensate BT in the event of a breach of Section 7 or Section 0 of this Agreement.  Accordingly, R&N agrees that in the event of such breach or threatened breach, BT shall, in addition to all other rights or remedies it may have, be entitled to seek and obtain equitable relief.

(c)    Entire Agreement; Binding Effect.  This Agreement represents the entire agreement of the parties pertaining to the subject matter contained herein, and shall supersede any and all prior oral and/or written agreements and communications between the parties.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors and assigns, including any purchaser of the Patent from BT.

(d)    Severability.  If any part, term or provision of this Agreement or the application thereof shall be held to be invalid, illegal or unenforceable, the remainder of this Agreement shall not be affected thereby, but shall remain in full force and effect to the extent permitted by law.

(e)    Governing Law and Jurisdiction.  This Agreement shall be governed and construed in accordance with the applicable laws of the State of New Hampshire without regard to conflicts of laws provisions.  Any litigation related to or arising out of this Agreement shall take place in the state or federal courts located in, New Hampshire.  R&N agrees to submit to such jurisdiction and waives any defense of inconvenient forum.

(f)    Waiver.  No covenant, condition, duty, obligation, or undertaking contained in or made a part of this Agreement shall be waived except by the written agreement of the parties.

(g)    Amendment.  The provisions of this Agreement may be changed or waived only by a written document signed by duly authorized representatives of the parties hereto.

(h)   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which need not contain the signatures of all parties hereto, and all of such counterparts taken together shall constitute one agreement.

(i)   <u>Lists</u>.  Any list of one or more items preceded by the words "include" or "including" shall not be deemed limited to the stated items but shall be deemed without limitation.

(j)   <u>Construction</u>.  Each and every provision of this Agreement has been mutually negotiated, prepared and drafted; each party has been represented by legal counsel and, in connection with the construction of any provision hereof or deletions herefrom, no consideration shall be given to the issue of which party actually negotiated, prepared, drafted or requested any provision or deletion.

*[signature page to follow]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

BOTTOMLINE TECHNOLOGIES, INC.

By: _____

Name: Robert Eberle
Title: President and COO

R&N CHECK CORP.

By: _____

Name: JERRY L. BEDELL
Title: PRESIDENT

*With regard to Section 7(a) and Section 8, only:*

_____
JERRY L. BEDELL

_____
DENNIS W. MCKEVITT

-11-

### ATTACHMENT I

### PATENT ASSIGNMENT

THIS PATENT ASSIGNMENT (this "Assignment") is entered into as of [January __, 2006] (the "Effective Date"), by and between R&N CHECK CORP., a California corporation with an address at 10605 Balboa Blvd, Suite 300, Granada Hills, California 91344 ("Assignor") and BOTTOMLINE TECHNOLOGIES, INC., a Delaware corporation with an address at 325 Corporate Drive, Portsmouth, New Hampshire, 03801 ("Assignee").

## W I T N E S S E T H

WHEREAS, Assignor has all right, title and interest in and to U.S. Patent No. 6,622,128, all reissuances, continuations, continuations-in-part, revisions, extensions, foreign equivalents and reexaminations of U.S. Patent No. 6,622,128, and all patents maturing from such patents (the "Patent(s)");

WHEREAS, concurrently with the execution of this Assignment the parties entered into that certain Patent Purchase and Settlement Agreement of even date herewith, pursuant to which Assignor irrevocably and unconditionally sold, assigned, transferred and conveyed to Assignee the entire right, title and interest in and to the Patents; and

WHEREAS, it is the purpose of this document to memorialize the aforementioned assignment and transfer in a form suitable for recordation with the United States Patent and Trademark Office and any other applicable office.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby assign to Assignee all right, title and interest in and to the Patents, together with the right to sue for past, present and future infringement of the Patent (including, without limitation, any current claims), to otherwise enforce the Patent, and all other rights and protections relating thereto, in any and all countries (collectively, the "Assigned Property"), free and clear of any claims, actions, suits, proceedings, investigations, charges, liens, contracts, rights, options, security interests, mortgages, writs,

judgments, injunctions, or other interests, encumbrances or restrictions, the same to have and to hold by Assignee as fully and entirely as the same would have been held by Assignor had this Assignment not been made.

Assignor hereby agrees as to all Assigned Property to assist the Assignee in every proper way (but at the Assignee's expense) to obtain and from time to time enforce patents and other rights and protections relating to the Assigned Property in any and all countries, and to that end Assignor will execute all documents for use in applying for and obtaining such patents and other rights and protections and enforcing the same, as Assignee may reasonably request, together with any assignments thereof to Assignee or persons designated by it.

[signature page to follow]

**IN WITNESS WHEREOF,** Assignor has caused this Assignment to be executed by its duly authorized representative.

**R&N CHECK CORP.**

By: _____

       Name:

       Title:

STATE OF_____  )

                ) ss.:

COUNTY OF _____  )

      On this the __ day of _____, 2006, before me, personally appeared _____ who, being by me duly sworn, did depose and say that he is the _____ of R&N Check Corp., the corporation described in and which executed the above instrument, and that he as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as _____ and attorney-in-fact.

IN WITNESS WHEREOF, I hereunto set my hand.

_____

Commissioner of Superior Court/Notary Public
My Commission Expires:

**Accepted:**

**BOTTOMLINE TECHNOLOGIES, INC.**

By: _____

       Name:

       Title:

STATE OF_____  )

                ) ss.:

COUNTY OF _____  )

      On this the __ day of _____, 2006, before me, personally appeared _____ who, being by me duly sworn, did depose and say that he is the _____ of _____, the corporation described in and which executed the above instrument, and that he as such _____, being authorized to do so, executed the foregoing instrument for the purposes therein contained, by signing the name of the corporation by himself as _____ and attorney-in-fact.

IN WITNESS WHEREOF, I hereunto set my hand.

_____

Commissioner of Superior Court/Notary Public
My Commission Expires:

**ATTACHMENT II**

Gregory S. Dovel (Bar No. 135387)
**DOVEL & LUNER, LLP**
201 Santa Monica Blvd., Suite 600
Santa Monica, California 90401
(310) 656-7066
(310) 656-7069 fax

David E. Rosen (Bar No. 155385)
**MURPHY ROSEN & COHEN LLP**
100 Wilshire Blvd., Suite 1300
Santa Monica, California 90401
(310) 899-3300
(310) 399-7201 fax

Attorneys for Plaintiff
R&N CHECK, CORP.

William A. White (Bar No. 121681)
G. Cresswell Templeton, III (Bar No. 138398)
**HILL, FARRER & BURRILL LLP**
One California Plaza, 37th Floor
300 South Grand Avenue
Los Angeles, CA  90071-3147
Telephone:  (213) 620-0460
Fax:  (213) 624-4840

Francis H. Morrison III (admitted *pro hac vice*)
Matthew J. Becker (admitted *pro hac vice*)
**DAY, BERRY & HOWARD LLP**
City Place I
Hartford, CT 06103
Telephone:  (860) 275-0100
Fax:  (860) 275-0343

Attorneys for Defendant
BOTTOMLINE TECHNOLOGIES, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| R & N CHECK, CORP. , <br><br> Plaintiff, <br><br> vs. <br><br> BOTTOMLINE TECHNOLOGIES, INC. et al. , <br><br> Defendants. | CASE NO.  CV05-4019 GPS (AJWx) <br><br> **STIPULATION AND ORDER OF DISMISSAL OF CLAIMS AND COUNTERCLAIMS, WITH PREJUDICE, PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 41(a)(1), 41(a)(2), AND 41(c).** |

# STIPULATION OF DISMISSAL OF CLAIMS AND COUNTERCLAIMS

Whereas, plaintiff R&N Check Corp. ("R&N") and defendant Bottomline Technologies, Inc. ("Bottomline") (collectively the "Parties") desire to resolve the issues in dispute between them, and agree to dismiss all claims and counterclaims of this action with prejudice.

NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between the Parties, through their respective attorneys of record, that the aforementioned claims be dismissed with prejudice in accordance with Federal Rule of Civil Procedure 41(a)(1) and the aforementioned counterclaims be dismissed with prejudice in accordance with Federal Rule of Civil Procedure 41(c).

The Parties further stipulate that each party will bear its own legal expenses of any kind incurred in this action, including, but not limited to, attorneys' fees and costs.

The Parties also request that the Court enter the attached proposed order consistent with this Stipulation pursuant to Federal Rule of Civil Procedure 41(a)(2).

DATED: January _____, 2006          DOVEL & LUNER, LLP


                                     By:
                                         _____
                                         Gregory S. Dovel, Esq.
                                         Attorneys for Plaintiff
                                         R&N CHECK, CORP


DATED: January _____, 2006          HILL, FARRER & BURRILL LLP


                                     By:
                                         _____
                                         William A. White, Esq.
                                         G. Cresswell Templeton, III, Esq.
                                         Attorneys for Defendant
                                         BOTTOMLINE TECHNOLOGIES,
                                         INC.

## ORDER

Based upon the stipulation and agreement of the Parties, good cause appearing therefore, and pursuant to Federal Rule of Civil Procedure 41(a)(2);

**IT IS SO ORDERED:**

1.      The claim for infringement of U.S. Patent No. 6,622,128 in the pending action filed by R&N Check Corp. and identified as *R&N Check Corp. v. Bottomline Technologies, Inc., et al.*, Central District of California Case No. 05-4019 (GPS) (AJWx), are dismissed with prejudice.

2.      The counterclaims for declaratory judgment of non-infringement and invalidity of U.S. Patent No. 6,622,128 filed by Bottomline Technologies in the above-referenced action are dismissed with prejudice.

3.      Each party shall bear its own legal expenses of any kind incurred in connection with the withdrawn claims and counterclaims, including, but not limited to, attorneys' fees and costs.

Dated:_____          _____

UNITED STATES DISTRICT JUDGE